# Exhibit A

**ELECTRONICALLY FILED**
Superior Court of California,
County of Alameda
**03/20/2025 at 01:14:12 PM**
By: Damaree Franklin,
Deputy Clerk

Andrew M. Morrow, III, Esq. - State Bar No. 128300
Ezequiel Zenon Gurule, IV, Esq.- State Bar No. 358197
Sako Demirjian, Esq. - State Bar No. 348609
Jordan Ashley Duncan-Smith, Esq. – State Bar No. 354658
**DOWNTOWN L.A. LAW GROUP**
612 S Broadway
Los Angeles, CA 90014
Tel: (213) 389-3765
Fax: (877) 389-2775
Email: Andy.morrow@downtownlaw.com
Email: Ezequiel@downtownlalaw.com
        Sako@downtownlalaw.com
        Jordan@downtownlalaw.com

*Attorneys for Plaintiffs*
*Nicole Jackson, et. al.*

**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF ALAMEDA**
**OAKLAND BRANCH**

| | |
|---|---|
| NICOLE JACKSON., an individual; SHELTON HARRIS, an individual; DEVIN JACKSON HARRIS, an individual; GRISELDA CAMPOS, an individual; ALFONSO AGUILAR LOPEZ, an individual; OMAR GARCIA, an individual; JESSE ACEVEDO, an individual; LETICIA ACEVEDO, an individual; BELEN ACEVEDO, an individual; JEREMIAH ACEVEDO, an individual; HAZEL ACEVEDO, an individual; ISABELLA ACEVEDO, an individual; FERNANDO PARTIDA, an individual; RICHARD CAMERON, an individual; ENRIQUE ROSILES, an individual; <br><br>         Plaintiffs, <br><br>    v. <br><br> VISTRA CORP., a Delaware corporation; VISTRA CORPORATE SERVICES COMPANY, a Texas corporation; DYNEGY OPERATING COMPANY, a Texas corporation; MOSS LANDING POWER | Case No.: 25CV116109 <br><br> **COMPLAINT FOR DAMAGES** <br><br> 1. **NEGLIGENCE** <br> 2. **PRIVATE NUISANCE** <br> 3. **TRESPASS TO REAL PROPERTY AND CHATTEL** <br> 4. **STRICT LIABILITY FOR ULTRAHAZARDOUS ACTIVITIES** <br> 5. **STRICT PRODUCT LIABILITY** <br> 6. **INVERSE CONDEMNATION** <br><br> **DEMAND FOR JURY TRIAL** |

COMPLAINT

COMPANY, LLC, a Delaware limited liability company; MOSS LANDING ENERGY STORAGE 3, LLC, a Delaware limited liability company; LG ENERGY SOLUTION, LTD., a South Korean company; L.G. ENERGY GROUP, LLC, a California limited liability company; LG ENERGY SOLUTION ARIZONA, INC., a Delaware stock corporation; LG ENERGY SOLUTION MICHIGAN, INC., a Delaware corporation; LG ENERGY SOLUTION VERTECH, INC., a Delaware corporation; PACIFIC GAS AND ELECTRIC COMPANY, a California corporation; and DOES 1 through 50, inclusive,

      Defendants.

COMPLAINT

COMES NOW PLAINTIFFS, NICOLE JACKSON., an individual; SHELTON HARRIS, an individual; DEVIN JACKSON HARRIS, an individual; GRISELDA CAMPOS, an individual; ALFONSO AGUILAR LOPEZ, an individual; OMAR GARCIA, an individual; JESSE ACEVEDO, an individual; LETICIA ACEVEDO, an individual; BELEN ACEVEDO, an individual; JEREMIAH ACEVEDO, an individual; HAZEL ACEVEDO, an individual; ISABELLA ACEVEDO, an individual; FERNANDO PARTIDA, an individual; RICHARD CAMERON, an individual; ENRIQUE ROSILES, an individual ("Plaintiffs"), by and through undersigned counsel, and submit this Complaint against Defendants VISTRA CORP., a Delaware corporation; VISTRA CORPORATE SERVICES COMPANY, a Texas corporation; DYNEGY OPERATING COMPANY, a Texas corporation; MOSS LANDING POWER COMPANY, LLC, a Delaware limited liability company; MOSS LANDING ENERGY STORAGE 3, LLC, a Delaware limited liability company; LG ENERGY SOLUTIONS, LTD., a South Korean Company; L.G. ENERGY GROUP, LLC, a California limited liability company; LG ENERGY SOLUTION ARIZONA, INC., a Delaware stock corporation; LG ENERGY SOLUTION MICHIGAN, INC., a Delaware corporation; LG ENERGY SOLUTION VERTECH, INC., a Delaware Corporation; PACIFIC GAS AND ELECTRIC COMPANY, a California corporation and DOES 1 through 50, inclusive, and each of them ("Defendants"), and allege as follows:

## I.    INTRODUCTION

### A.    The Moss Landing Facility

1.    The Moss Landing Power Plant is a natural gas-powered electricity generation plant as well as a battery energy storage facility, located at 7301 State Highway 1 in Moss Landing, California. As of 2024, the site's battery storage facility is the largest in the world. The energy storage facility stores excess electricity for later use during periods of lower electricity production. Excess electricity is typically produced by solar electricity during the daytime.

2.    The battery energy storage facility at Moss Landing consists of two smaller energy storage facilities. The first battery storage facility is known as the Moss Landing

COMPLAINT

300 megawatt Phase I battery energy storage system (BESS) facility. The second is the Elkhorn Battery Facility. Both are owned, operated, managed, and controlled by Defendants.

**B.    The Incident**

3.    At 3:00 pm on Thursday, January 16, 2025, a fire broke out in the 300 MW Phase 1 building, the portion of the site managed by Vistra. Battery systems made of lithium nickel manganese cobalt oxides ignited in the concrete hall structure creating large flames that could be seen for miles. The building's outdated fire suppression system failed to extinguish the fire. The fire was contained within the area of the concrete storage building, an enclosed structure inside the building. This condition may have contributed to the spread of the fire which increased in size rapidly resulting in dangerous toxic emissions affecting whole communities in the adjacent region.

4.    As with lithium battery fire protocols, firefighters did not try to extinguish the blaze, but let it burn. Such fires typically release toxic gases as they burn. In particular, hydrogen fluoride and other hazardous materials. During the two days of the fire wind velocities were low, allowing the smoke plume to rise high into the atmosphere before much dispersion occurred. By Friday morning the fire appeared to have largely gone out, however by early Friday afternoon the fire had increased in intensity once again. Later in the day the flames subsided after nearly 80% of the battery section burned.

5.    The Vistra Fire, as it became known, affected upwards of 100,000 people in the region and led to a local state of emergency declaration and required the evacuation of approximately 1,500 residents. This upheaval resulted in the closure of schools, major roads, commerce, and agricultural operations. The toxic cloud caused by the fire spread across the region contaminating land, households, and businesses with heavy metal particulates. Subsequent sampling revealed unusually high levels of toxic metals in soils a mile from the fire at levels 100 to 10,000 times higher than normal.

6.    The Defendants knew or should have known when designing, maintaining, and otherwise operating the Moss Landing facility that large thermal reactions and fires were

a significant problem. In fact, the Moss Landing facility suffered two prior fires in 2021 and in 2022, made worse by the facilities design and deficiencies in the fire suppression system.

7.     Plaintiffs and each of them are residents of the nearby area who were impacted by the fire. Plaintiffs and each of them were exposed to smoke, ash, particulate matter, and dangerous toxic chemicals, which led many to experience respiratory distress, eye and throat irritation, headaches and other health complications as set out here. Plaintiffs' property and property rights were also affected. Not only were the Plaintiffs unable to fully use and enjoy their properties, but some were also entirely displaced altogether due to the mandatory evacuations and dangerous conditions caused by the Vistra Fire. Plaintiffs' real and personal properties were covered by soot, ash, and toxic chemicals, including heavy metals, from the fire. Plaintiffs suffered, and will continue to suffer economic losses, including loss of income due to business closures, expenses associated with forced evacuations, as well as future environmental mitigation and remediation costs. They sue to recover compensatory damages for these harms.

## II.     **THE PARTIES**

### A.     **Plaintiffs**

8.     At all relevant times hereto, Plaintiffs are individuals and other legal entities who were/are homeowners, renters, residents, occupants, and had property and/or owned businesses in Monterey County in areas impacted by the Moss Landing BESS fire.

9.     Plaintiffs have all suffered damages, losses, and harm from the Defendants' tortious actions and inactions.

10.     Plaintiffs have elected to join their individual lawsuits in a single action under rules of permissive joinder. Plaintiffs do not seek class certification or relief on any class-wide, collective, or other group basis, but seek the damages and other remedies identified herein on an individual basis according to proof at trial.

### B.     **Defendants**

11.     Defendant VISTRA CORP. is a publicly traded stock corporation incorporated and existing under Delaware law, with a principal address at 6555 Sierra Drive,

COMPLAINT

Irving, TX 75039. VISTRA CORP. is the owner of the Moss Landing Power Plant, including the Moss Landing BESS facility.

12.    Defendant VISTRA CORPORATE SERVICES COMPANY ("VISTRA CORP. SERVICES CO") is a corporation incorporated and existing under Texas Law and is registered as a foreign corporation authorized to do business in California, with a principal address at 6555 Sierra Drive, Irving, TX 75039. VISTRA CORP. SERVICES CO is a wholly owned subsidiary of VITRA CORP. and is likely a managing entity of Defendant MOSS LANDING POWER CO LLC.

13.    Defendant DYNEGY OPERATING COMPANY ("DYNEGY OPERATING CO"), is a corporation incorporated and existing under Texas Law and is a foreign company authorized to do business in California, with a principal address at 6555 Sierra Drive, Irving, TX 75039. DYNEGY OPERATING CO is a wholly owned subsidiary of Defendant VISTRA CORP. and is likely a managing entity of Defendant MOSS LANDING POWER CO LLC.

14.    Defendant MOSS LANDING POWER COMPANY, LLC ("MOSS LANDING POWER CO LLC"), is a limited liability company organized and existing under Delaware law, with a principal address at 6555 Sierra Drive, Irving, TX 75039, and is registered to do business as a foreign limited liability company in California. On information and belief, MOSS LANDING POWER CO LLC had and continues to have a facility located at 7301 State Highway 1, Moss Landing, Monterey County, California 95039, the location of "the fire." MOSS LANDING POWER CO LLC is a wholly owned subsidiary of Defendant VISTRA CORP., and operates the Moss Landing Power Plant, including the Moss Landing BESS on behalf of Defendant VISTRA CORP.

15.    Defendant MOSS LANDING ENERGY STORAGE 3, LLC, ("MOSS LANDING ENERGY STORAGE 3 LLC") is a limited liability company incorporated and existing under Delaware law with a principal address at 6555 Sierra Drive, Irving, TX 75039, and is registered to do business as a foreign limited liability company in California.

16.     Defendants MOSS LANDING POWER CO LLC, MOSS LANDING ENERGY STORAGE 3 LLC; VISTRA CORP., DYNEGY OPERATING CO, and VISTRA CORPORATE SERVICES COMPANY are collectively referred to as "VISTRA DEFENDANTS." The VISTRA DEFENDANTS are a "public utility" under Public Utilities Code sections 216(a)(1), 216(c), and 218(a)(17).

17.     Defendant LG ENERGY SOLUTION, LTD. is a battery company headquartered in Seoul, South Korea.  Upon information and belief, LG Energy Solutions, Ltd. supplied and installed the lithium-ion batteries at Moss Landing BESS.

18.     Defendant L.G. ENERGY GROUP, LLC is a limited liability company incorporated and existing under California Law, with a principal address at 1510 Fashion Island Blvd., Suite 240, San Mateo, California 94404. Upon information and belief, L.G. ENERGY GROUP, LLC is a wholly owned subsidiary of Defendant L.G. ENERGY SOLUTION, LTD.

19.     Defendant LG ENERGY SOLUTION ARIZONA, INC. is a stock corporation incorporated and existing under Delaware Law and registered as an out-of-state stock corporation authorized to do business in California, with a principal address at 2540 N. First Street, Stuie 400, San Jose, California 95131. Upon information and belief, LG ENERGY SOLUTION ARIZONA, INC. is a wholly owned subsidiary of Defendant LG ENERGY SOLUTION, LTD.

20.     Defendant LG ENERGY SOLUTION MICHIGAN, INC. is a corporation incorporated and existing under Delaware Law and registered to do business in California, with a principal address at 1 LG Way, Holland, MI 49423. Upon information and belief, LG ENERGY SOLUTION MICHIGAN, INC. is a wholly owned subsidiary of Defendant LG ENERGY SOLUTION, LTD.

21.     Defendant LG ENERGY SOLUTION VERTECH, INC. is a corporation incorporated and existing under Delaware Law and registered to do business in California, with a principal address at 155 Flanders Road, Westborough, MA 01581. Upon information

1    and belief, LG ENERGY SOLUTION VERTECH, INC. is a wholly owned subsidiary of

2    Defendant LG ENERGY SOLUTION, LTD.

3         22.    LG ENERGY SOLUTIONS, LTD., L.G. ENERGY GROUP, LLC, LG

4    ENERGY SOLUTION ARIZONA, INC., LG ENERGY SOLUTION MICHIGAN, INC.,

5    and LG ENERGY SOLUTION VERTECH, INC., are referred to collectively as "LG

6    DEFENDANTS."

7         23.    Defendant PACIFIC GAS AND ELECTRIC COMPANY ("PG&E") was, at

8    all times relevant to this pleading, a California corporation authorized to do and doing

9    business in California with its headquarters at 300 Lakeside Drive, Oakland, California. At

10   all times relevant to this pleading, PG&E acted to provide a utility, including electrical

11   services, to members of the public in California, including residents of Monterey County.

12   PG&E is one of the largest combination natural gas and electric utilities in the United States.

13        24.    Residents and businesses in Monterey County and other places pay PG&E to

14   provide electricity through a utility infrastructure, including a network of electrical

15   transmission and distribution lines. PG&E is a "public utility" under Public Utilities Code

16   sections 216(a)(1) and 218(a).

17        25.    On information and belief, VISTRA DEFENDANTS planned, built, operated,

18   and continue to operate the Moss Landing BESS facility along and in concert with the PG&E

19   and others. VISTRA DEFENDANTS' and PG&E's acts and omissions, as more particularly

20   described below, resulted in the Vistra Fire that harmed the Plaintiffs.

21        26.    At all times relevant to this pleading, VISTRA DEFENDANTS and PG&E

22   acted to provide a utility, including electrical services, to members of the public in

23   California, including residents of Monterey County. The VISTRA DEFENDANTS and

24   PG&E used the lithium-ion batteries manufactured by the LG DEFENDANTS to store

25   electricity as part of an electrical distribution system serving Central, Coastal, and Northern

26   California for the benefit of the public.

27        27.    The Moss Landing BESS is connected to PG&E through an interconnection

28   facility ("IF") on site. As agreed, PG&E was responsible for the construction of the IF. Upon

COMPLAINT

1   information and belief, PG&E also controls most of the Moss Landing BESS. For instance,

2   PG&E is expressly authorized to: (1) control the type of equipment used at VISTRA'S Moss

3   Landing facility; (2) review specifications for VISTRA's Moss Landing facility; (3) inspect

4   VISTRA'S Moss Landing facility; (4) require installation of certain communications items at

5   VISTRA'S Moss Landing facility; (5) dictate operations at VISTRA'S Moss Landing

6   facility; and (6) set VISTRA'S minimum insurance coverage at the Moss Landing facility.

7   Also, PG&E and VISTRA have agreed to indemnify, defend, and hold the other Party

8   harmless from acts such as those alleged in the Complaint.  PG&E's agreement with

9   VISTRA further requires the creation of a Joint Operating Committee to coordinate operating

10  and technical considerations of Interconnection Service.

11          28.     Comments by PG&E also reflect their close partnership with VISTRA. For

12  example, PG&E stated it was "ushering in a new era of electric system reliability and

13  delivering a vision into the future for our customers with the commissioning of the Vistra

14  Moss Landing energy storage facility," adding "[p]rojects like this require great partners,

15  such as Vistra, and PG&E will continue to seek out and work with the best and brightest to

16  provide breakthrough clean energy

17  solutions for our customers."

18          29.     LG DEFENDANTS (collectively "LG DEFENDANTS") is each a battery

19  company and one of the largest battery manufacturers in the world. In 2021, their revenues

20  were $27.2 Billion.

21          30.     The LG DEFENDANTS have one plant in Michigan and one joint venture

22  with General Motors. They are building a $5.5 billion stand-alone battery manufacturing

23  complex in Arizona.  The LG DEFENDANTS are registered to do business in California.

24  Plaintiffs are informed and believe that the LG DEFENDANTS directly and purposefully

25  conducted business with the other Defendants in California by selling, distributing,

26  delivering, designing, and installing the lithium-ion batteries at issue here to the other

27  Defendants and coordinating and planning with them.

28

COMPLAINT

31.     Defendants are each jointly and severally liable to the Plaintiffs for the damages Plaintiffs sustained as a direct and proximate result of Defendants' conduct, as alleged in this Complaint. Plaintiffs are informed and believe and thereon allege that each of the Defendants were, at all pertinent times, the agents, servants, employees, officers, directors, joint venturers, and/or partners, parents, affiliates, subsidiaries, successor-in-interests, related entities, of each of the other Defendants, and are each liable for their own actions and inactions.

32.     At all times relevant to this pleading, Defendants, individually and/or jointly, were the agents, servants, employees, partners, aiders and abettors, co-conspirators, and/or joint venturers of each of the other Defendants; and were operating within the purpose and scope of said agency, service, employment, partnership, enterprise, conspiracy, and/or joint venture; and each of Defendants has ratified and approved the acts of each of the remaining Defendants. Each of Defendants aided and abetted, encouraged, and rendered substantial assistance to the other Defendants in breaching their obligations and duties to Plaintiffs, as alleged here. In acting to aid and abet and substantially assist the commission of these wrongful acts and other wrongdoings alleged here, each of Defendants acted with an awareness of his/her/its primary wrongdoing and realized that his/her/its conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and wrongdoing or was willfully ignorant of those wrongdoings.

33.     The names of other Defendants and/or their involvement in the events giving rise to the claims alleged herein are unknown to Plaintiffs. Plaintiffs, therefore, sue such Defendants by fictitious names, identified as DOES 1 through 50, inclusive. Plaintiffs will seek leave of Court to amend this Complaint to reflect the true names and capacities of Defendants designated as DOES 1 through 50, inclusive, when their identities and/or involvement become known.

///
///
///

COMPLAINT

### III. JURISDICTION AND VENUE

34.    Venue is proper in Alameda County because the headquarters of PG&E is in Oakland, California, which is in Alameda County. Defendants also conduct business and owned and/or operated utility infrastructure in Alameda County. Plaintiffs are informed and believe, and thereon allege, that PG&E conducted business in Alameda County at the time it committed the negligent acts and omissions that give rise to this Complaint, and Alameda County is where the liability arises.

35.    Code of Civil Procedure sections 395(a), 395.5, and 410.10 give this Court jurisdiction over this matter because Defendant PG&E is incorporated in California, has its headquarters in Oakland, California, resides in and does significant business in the County of Alameda, engages in most of its corporate activities in California, and maintains the majority of its corporate assets in California.  In addition, the VISTRA DEFENDANTS reside in and do significant business in California, engage in significant corporate activities in California, and maintain significant corporate assets in California. Finally, the LG DEFENDANTS are licensed to do business in California and do business in California.  These facts render the exercise of jurisdiction over Defendants consistent with the traditional notions of fair play and substantial justice.

36.    The Alameda County Superior Court is a court of general jurisdiction and has subject-matter jurisdiction over this unlimited civil case, as well as personal jurisdiction over each of the Defendants.

### IV. FACTS

37.    The Moss Landing Power Plant, located in Moss Landing, California, was first designed as an electrical generation plant, and was once the largest power plants in California with a generation capacity of 2560 MW, before its two large supercritical steam units were retired in 2016. Originally commissioned in 1950, the plant has evolved over the decades and currently operates as a natural gas-fired power station with a capacity of 1,060 megawatts. In recent years, it has expanded to include two separate battery energy storage facilities: the Vistra Moss Landing BESS, and the Elkhorn Battery Facility which is owned

by PG&E. Moss Landing Power Plant is the world's largest commercial electric battery energy storage site.

38.    VISTRA ENERGY acquired the Moss Landing Power Plant in 2018 and operates both the power generating plant and the Vistra Moss Landing BESS.

39.    The Moss Landing BESS has power lines and interconnections that allow power to flow to far-away regions. The plant is also connected to local loads and the San Jose region by transmission lines.

40.    The Moss Landing BESS facility is co-located with the Moss Landing Power Plant, in Moss Landing's industrial area, northeast of the Highway 1 and Dolan Road intersection. Adjoining the property to the north is PG&E'S electric transmission operations and maintenance headquarters, and to the south is Dolan Road and the Moss Landing Business Park. Moss Landing Harbor lies west of the property on the other side of Highway 1.

41.    The Moss Landing BESS facility is situated close to residential, commercial, agricultural and public properties.    Residential neighborhoods, including Moss Landing and portions of Elkhorn Slough, where thousands of residents live, are located within a two-mile radius of the facility. The facility is also adjacent to businesses and agricultural operations.

42.    The Elkhorn Slough Reserve, a protected wetland area of ecological significance, is located less than one mile from the facility. The Reserve is home to diverse wildlife and serves as a vital recreational and educational resource for the community and visitors.

43.    Public institutions, such as the North Monterey County Unified School District campuses, are also situated within a short distance of the facility. The District serves more than 4,500 K-12 students, and covers a 70 square-mile area, including neighborhoods in Castroville, Prunedale, Moss Landing, Aromas and parts of Salinas, California.

44.    The area surrounding the Moss Landing Facility includes critical transportation routes, including State Highway 1, which provides vital access to the region.

45.     The Vistra Moss Landing BESS facility, located at 7301 State Highway 1, Moss Landing, Monterey County, California 95039, is a large-scale lithium-ion battery storage facility owned and operated by the VISTRA DEFENDANTS. Before the Vistra Fire, it had a capacity of 750/3,000 megawatt-hours ("MWh"), making it one of the largest energy storage sites in the world, and the largest one in California.

46.     In 2018, VISTRA ENERGY announced plans for the energy storage system at the site of Moss Landing Power Plant, using the existing turbine building and existing interconnection from retired steam units 6 and 7, connecting to the 500 kV grid. VISTRA ENERGY expected the energy storage system to begin commercial operation by the end of 2020, pending receipt of approval from the California Public Utilities Commission (CPUC).

47.     The Moss Landing BESS facility was built by the VISTRA DEFENDANTS and PG&E in three phases.

48.     Phase I (involved in the Vistra Fire) has a capacity of 300 MW/1,200 MWh, meaning that the system can discharge up to 300 megawatts (MW) of power at its peak, and can store 1,200 MWh of energy in total.

49.     Construction of Phase I commenced in December 2019 and was completed in 2020. The Phase I project had three major components: a battery energy storage system; a power conversion system; and a substation. The substation would first receive energy from the electrical grid; next, the energy current was converted through the power conversion system; the energy was then stored within the battery energy storage until it was used during peak demand. When needed, stored energy was to be routed out from the batteries through the power conversion system and substation and into the electrical transmission grid.

50.     Phase I's battery storage consisted of thousands of LG JH4 lithium-ion battery cells manufactured, provided, and designed by the LG DEFENDANTS, contained in battery racks in two stories of the preexisting, enclosed and roofed turbine building.

51.     Phase I is dangerously unique as one of only 1% of lithium-ion storage facilities that are indoors. The remaining 99% of lithium-ion storage facilities are outdoors.

COMPLAINT

Placing a lithium-ion storage facility indoors, like the Defendants did at Phase 1, is dangerous, a fact that the Defendants knew or should have known.

52.    The LG DEFENDANTS designed, sold and provided the NMC lithium-ion batteries used to store electricity for the VISTRA DEFENDANTS and Defendant PG&E. The stored electricity would then be sold to utility customers in Monterrey County and beyond.

53.    The NMC batteries used at the Moss Landing BESS Facility, as all Defendants knew or should have known, were far more dangerous and volatile than LFP batteries, particularly when contained in enclosed spaces like at Moss Landing Phase I.

54.    In fact, on September 4, 2021, nine months after coming fully online, Phase I suffered an overheating incident with multiple the LG batteries.

55.    The Moss Landing BESS facility connected to the power grid and began operating on December 11, 2020, with a capacity of 300 MW/1200 MWh.

56.    Defendants announced that Phase I was operational on January 6, 2021.

57.    At that time, the VISTRA DEFENDANTS also thanked Defendant PG&E for the "strong working relationship" backed by long-term resource adequacy contracts, which had been approved by CPUC.

58.    By August 2021, the Defendants had completed Phase II of the Moss Landing BESS, which included a 100-megawatt expansion, bringing the facility's total capacity to 400 MW/1,600 MWh, making it the largest of its kind in the world.

59.    On August 19, 2021, VISTRA DEFENDANTS, LG DEFENDANTS, and Defendant PG&E along with federal, state, and local elected officials and business leaders attended the opening of the Moss Landing BESS Phase II as guests and speakers for a ribbon-cutting ceremony, news conference, and site tours.

60.    Construction of Phase III was completed in May of 2023, and with another 350 MW/1,400 MWh brought the Moss Landing BESS facility's total capacity to 750 MW/3,000 MWh. Phase III, unlike Phase I, was constructed outside.

61. The Moss Landing BESS facility stores power using a lithium-ion battery system, using NMC technology from LG Energy Solutions. A system utilizing NMC batteries is more dangerous than a system utilizing LFP batteries.

62. LFP batteries, unlike NMC batteries do not contain cobalt, making them less prone to overheating, and thus less likely to experience thermal runaway.

63. Lithium-ion BESSs have the potential to pose a new and emerging threat to public health and safety. Lithium batteries can overheat, creating thermal runaway, causing fire and explosions, releasing hazardous materials in the form of toxic plumes and toxic runoff due to fire suppression tactics. Lithium-ion batteries will overheat, catch on fire, and even explode when they are damaged, improperly used, charged, or stored.

64. Thermal runaway is one of the primary risks related to lithium-ion batteries. It is a phenomenon in which the lithium-ion cell enters an uncontrollable, self-heating state. In ideal conditions, the heat can dissipate from the cell. But in thermal runaway, the lithium-ion cell generates heat at a rate several times higher than the rate at which heat dissipates from the cell.

65. Thermal runaway is a self-accelerating reaction that can occur when the battery is overcharged, short-circuited, or physically damaged. Thermal runaway is the primary failure mechanism for lithium-ion batteries. When oxygen mixes with the toxic flammable gases, the battery cell may ignite, causing surrounding cells to do the same, leading to catastrophic conditions.

66. If the pressure within the cell reaches a critical point, the cell can rupture, releasing flammable gases and in some examples, projectiles at high speeds. These gases can combine with oxygen in the air and form an explosive mixture.

67. Lithium-ion battery fires generate intense heat and considerable amounts of gas and smoke. The gas released from BESSs is highly flammable and toxic. The type of gas released depends on the battery chemistry involved but typically includes gases such as hydrogen fluoride ("HF"), phosphoryl fluoride ("POF3"), carbon monoxide ("CO"), carbon dioxide ("CO2"),

hydrogen ("H2"), methane ("CHa"), ethylene ("C2Ha"), ethylene oxide ("C2HaO"), and other hydrocarbons.

68.    Massive quantities of water over an extended period is the only established means of preventing continuous thermal runaway in a lithium-ion battery. This can result in hazardous runoff.

69.    Lithium-ion battery-related fires generate unique and highly toxic emissions compared to other types of fires. The release of toxic gases, such as HF and CO, is one of the most critical concerns in lithium-ion battery related fires.    HF is especially dangerous, with an immediate dangerous to life or health (IDLH) concentration of 0.025 g/m (30 parts per million [ppm]) and a lethal 10-minute toxicity level (AEGL-3) of 0.0139 g/m (170 ppm). Acute exposure to HF can lead to severe respiratory damage, burns, and systemic toxicity. Other gases, including CO and HCN, have been detected in concentrations exceeding occupational safety thresholds, emphasizing the health risks.

70.    Particulate matter (PM) released during lithium-ion battery-related fires contains harmful metals such as cobalt, aluminum, copper, lithium, manganese, nickel, and zinc. These metals can contaminate the surrounding environment, including soil and water. Ambient PM is linked to respiratory and cardiovascular diseases, and its inhalation represents a significant health risk. In addition, the release of polycyclic aromatic hydrocarbons (PAHs) poses long-term health concerns due to their carcinogenic nature.

71.    Fires at facilities like the Moss Landing BESS raise concerns about potential environmental contamination. Toxic substances such as HF, CO, smoke, and fine PM can affect air quality and pose significant risks to nearby residents. Wet and dry deposition of the gases, chemicals, and heavy metals in these plumes, can infiltrate soil and water bodies, leading to further environmental degradations. Contaminants from the fire are persistent and pose long-term risks to ecosystems and public health.

72.    On January 16, 2025, at or around 3:00 p.m., the Vistra Fire broke out at the 300- MW Phase I portion of the Moss Landing BESS facility. By 5:35 p.m., flames were

reported on the roof of the facility. The fire burned through the night and flared up again the next day.

73. Despite the presence of a built-in heat suppression system, the system failed to prevent thermal runaway in the battery system and the resulting fire spread uncontrollably.

74. The failure of the Moss Landing BESS's heat and fire suppression system significantly hindered efforts to contain the fire. Designed to prevent such catastrophic incidents, the system's malfunction, in conjunction with the facility design that placed thousands of batteries prone to thermal runaway close together in an enclosed space, allowed the fire to spread rapidly, causing extensive damage and releasing large quantities of smoke, ash and toxic emissions.

75. Firefighters faced significant challenges in addressing the blaze due to the unique hazards posed by lithium-ion battery fires. Lithium-ion batteries contain flammable electrolytes that, when overheated, can cause thermal runaway. Traditional firefighting methods, such as applying water or foam, were deemed ineffective because they can react with the chemicals in the batteries, producing toxic gases like HF or potentially causing explosions. Additionally, lithium- ion battery fires generate extreme heat and can reignite even after appearing extinguished, making them particularly difficult to control.

76. These conditions were exacerbated by the Defendants use of NMC batteries that are more volatile than newer alternatives LFP batteries as well as the batteries being stored in an enclosed structure as opposed to safer modular battery containers.

77. Responding firefighters did not engage the blaze directly due to the high risk of explosion and the toxicity of the emissions, opting instead to let the fire burn itself out over several days.

78. The Vistra Fire released significant amounts of smoke, PM, toxic gases, including HF, CO, and other hazardous compounds associated with lithium-ion battery combustion.

79. The fire and the associated toxic chemical plume had a catastrophic effect on communities surrounding the facility, disrupting life and business.

80.    On January 16, 2025, around 10:30 p.m., Monterey County authorities issued evacuation orders for approximately 1,200 to 1,500 residents in the Moss Landing and the Elkhorn Slough communities.

81.    Residents were instructed to leave their homes immediately due to the toxic smoke emanating from the Moss Landing BESS. Additional evacuation orders were issued on January 17, 2025, at 8:00 a.m., expanding the evacuation zone to include areas within a two-mile radius of the Moss Landing BESS facility.  These orders caused significant disruption to residents and businesses, forcing many to seek temporary shelter, arrange emergency accommodations, and incur unexpected expenses.

82.    The North Monterey County Unified School District announced closures early on January 17, 2025, citing concerns over air quality and safety for students and staff.

83.    The Elkhorn Slough Reserve was closed from January 17-21, 2025, due to the evacuation order and subsequent potential risks from the Vistra Fire.

84.    On January 16, 2025, residents in surrounding counties, including Santa Cruz and San Benito, were advised to stay indoors, close windows and doors, and turn off ventilation systems to minimize exposure to hazardous air. This advisory was reiterated on January 17, 2025, as smoke and toxic emissions persisted.

85.    Due to safety concerns from toxic smoke and limited visibility, at or around 5:52 p.m. on January 16, 2025, officials closed State Highway 1. The Highway was not reopened until January 19, 2025, at 5:00 p.m. These disruptions significantly impacted commuters and transport-dependent businesses, leading to delays, rerouting of freight traffic, and compounding economic losses for local enterprises.  The closures also heightened logistical challenges for emergency services and residents attempting to access essential resources.

86.    Residents of nearby communities, including the Plaintiffs, were exposed to smoke and toxic emissions. Many experienced respiratory distress, eye and skin irritation, headaches, nose bleeds, and other physical symptoms due to the exposure.

COMPLAINT

87.     Defendants knew or should have known of the significant risks posed by the storage and operation of large-scale lithium-ion batteries, including the potential for thermal runaway, catastrophic fires and toxic emissions.

88.     Defendants failed to implement adequate safety measures, fire prevention protocols, and emergency response plans to mitigate the known risks associated with lithium-ion battery storage, causing substantial damage to the Plaintiffs.

89.     As of the time of filing of this Complaint, local and state environmental agencies are still assessing the immediate and the long-term impacts of the Vistra Fire.

90.     But local scientists and scholars have detected unusually high concentrations of heavy-metal particles in soils at Elkhorn Slough Reserve following the fire.

91.     These heavy metals will chemically transform as they move through the environment affecting aquatic and terrestrial ecosystems.

92.     Monterey County advised that soil sampling near the fire area was conducted by the California Department of Toxic Substances Control (DTSC) on January 24, 2025, revealing increased levels of Cobalt, Nickel, Copper, and Manganese.

93.     The County's preliminary sampling for Cobalt exceeded U.S. Environmental Protection Agency (EPA) carcinogenic target risk from inhalation screening levels for residential soil at XRF Sites 7 and 8; and XRF Sites 1, 2, 4, and 5 exceeded EPA noncarcinogenic target hazard index screening level for children in residential soil.

94.     Preliminary XRF scans for Nickel and Copper exceeded EPA carcinogenic target risk from inhalation screening levels for residential soil at XRF Site 8.

95.     Preliminary XRF scans for Manganese exceeded EPA noncarcinogenic target hazard index screening level for children in residential soil at XRF Site 8.

96.     Defendants' tortious conduct has caused the Plaintiffs to suffer harm, injuries, and damages including, but not limited to, those identified below.

97.     The fire resulted in the release of massive plumes of smoke, ash and toxic chemicals into the surrounding communities. Those exposed to these emissions have suffered, and continue to suffer from inconvenience, annoyance, and personal discomfort.

COMPLAINT

That inconvenience, personal discomfort, and annoyance is including, but not limited to, nasal and eye irritation, difficulty breathing, headaches, nosebleeds, sore/scratchy throat, lung congestion, fatigue, runny nose/nasal drip, burning lungs, dizziness, shortness of breath, unexplained discharge of blood, sores, metal taste, inability to focus, unusual smells, lung irritation, and skin irritation.  Many have sought medical help for their symptoms. Those with respiratory disorders have seen these conditions exacerbated.

98.     In addition, Plaintiffs' mental health has been adversely impacted because by the injury to the peaceful enjoyment of the property that they occupied, and Plaintiffs have suffered fear, severe emotional distress, anxiety, and mental anguish.

99.     Due to the fire, approximately 1,500 residents of Monterey County were abruptly ordered to evacuate from their homes. Some Plaintiffs were among these evacuees. Many have had to leave their homes for considerable periods of time. In addition to suffering the trauma and inconvenience associated with a sudden evacuation from their homes, Plaintiffs have incurred evacuation and alternative living expenses as well as cleanup costs.

100.     With schools closing on January 17, 2025, parents were forced to take time off from work to care for their children, losing wages and/or having to use their vacation and sick time.

101.     Plaintiffs that work in the areas affected by the fire and the chemical plume have been unable to work or derive income during the event and its aftermath.

102.     Soot, ash, debris, PM, heavy metals and other substances from the fire deposited on real and personal property of the Plaintiffs, and have caused staining, damage to paint and exterior surfaces, soil, and contamination of HVAC systems, necessitating costly repairs, cleaning and remediation of the properties.

103.     Plaintiffs have suffered and continue to suffer from heavy metal deposition from the fire onto their property.

104.     Gardens, agricultural fields, and outdoor amenities were similarly impacted. Due to the hazardous nature of the chemicals associated with lithium-ion battery fires, soil

COMPLAINT

testing will be required to assess and mitigate contamination. Those Plaintiffs with groundwater wells will require long-term groundwater testing and monitoring as the heavy metals that were deposited on structures, foliage, vehicles, etc. from the Vistra Fire can be redeposited via washing and precipitation to soil and can migrate through the soil causing groundwater contamination.

## FIRST CAUSE OF ACTION

### NEGLIGENCE

### (Against All Defendants)

105.    Plaintiffs adopt and incorporate Paragraphs 1-105 as if fully stated here.

106.    As operators large-scale lithium-ion battery storage facility, Defendants, who have superior knowledge of the dangers associated with lithium-ion battery fires, owed the Plaintiffs a non-delegable duty to conduct their operations in a safe manner, including a duty to design, maintain and operate their Moss Landing BESS facility safely, in a manner that protected the public, including the Plaintiffs, from chemical exposure and environmental hazards.

107.    Defendants' duties included but were not limited to a duty to ensure proper safety protocols, fire prevention measures, and storage and handling procedures to mitigate the risk of chemical reactions, explosions and harmful emissions of toxic substances.

108.    Defendants knew or should have known that NMC batteries can overheat, creating thermal runaway, can cause fire and explosions, and can cause releases of hazardous materials in the form of toxic plumes.

109.    Defendants knew or should have known that NMC batteries were prone to fires.

110.    Defendants knew or should have known that storing NMC batteries in an enclosed structure was dangerous.

111.    Defendants breached duties owed to the Plaintiffs by, among other things:

a. Failing to design, operate, maintain, and/or repair their Moss Landing BESS facility in such a way as to ensure its safe and proper operation;

COMPLAINT

b.  Failing to monitor and mitigate risks associated with NMC lithium-ion battery storage;

c.  Failing to implement adequate safety protocols to prevent overheating and fires;

d.  Failing to maintain a functional fire suppression system;

e.  Failing to ensure proper procedures or systems for timely identifying any malfunctions or limitations of the facility's fire suppression system;

f.     Failing to ensure proper safety procedures in the event of a fire suppression system malfunction;

g.  Failing to prevent runaway chemical reactions at their facility;

h.  Failing to warn Plaintiffs and the public of the risks associated with the facility;

i.     Igniting large volumes of chemicals in such a way that tens of thousands of people were likely to be exposed; and

j.     Any other negligent acts and/or omissions which may be discovered and proven at the trial of this matter.

112.    As the direct and proximate result of the Defendants' negligence, significant quantities of ash, soot, smoke and toxic chemicals were released into the surrounding communities and harmed the Plaintiffs.

113.    The harm to the Plaintiffs was reasonably foreseeable.

114.    Plaintiffs have suffered injuries, damages and losses, including, but not limited to, those damages previously described. Such harms were unique to each Plaintiff and different from damages suffered by other Plaintiffs.

115.    Accordingly, Plaintiffs each seek damages to be determined, on an individual basis, according to proof at trial, including, but not limited to, compensatory damages for medical care, pain and suffering, emotional anguish, injury to real and personal property, loss of income and relocation and evacuation expenses.

COMPLAINT

# SECOND CAUSE OF ACTION

## PRIVATE NUISANCE

### (Against All Defendants)

116.    Plaintiffs adopt and incorporate Paragraphs 1-116 as if fully stated here.

117.    Plaintiffs are in lawful possession of their property.

118.    Defendants owned, maintained, operated, and otherwise controlled the Moss Landing BESS facility.

119.    Defendants' negligent, reckless, intentional and/or abnormally dangerous actions and inactions created conditions and/or permitted conditions to exist that were harmful to health, offensive to the senses, obstructed and/or entirely prevented free use of property, as to substantially interfere with the comfortable use and enjoyment of property by persons of ordinary sensibilities.

120.    These conditions, including, but not limited to, soot, smoke, ash, debris, particulate matter, and other toxic chemicals materially and significantly interfered with Plaintiffs' right of use and quiet enjoyment of their property in a way unique to each Plaintiff.

121.    Plaintiffs' enjoyment of life and property has been rendered materially uncomfortable and annoying. As the result of the fire Plaintiffs were subjected to noxious fumes, toxic chemicals, and unsafe air quality, which rendered their homes and properties unfit for occupancy and use.

122.    Those exposed to these emissions have suffered, and continue to suffer damages from inconvenience, annoyance, and personal discomfort. That inconvenience, personal discomfort, and annoyance is including, but not limited to, nasal and eye irritation, difficulty breathing, headaches, nosebleeds, sore/scratchy throat, lung congestion, fatigue, runny nose/nasal drip, burning lungs, dizziness, shortness of breath, unexplained discharge of blood, sores, metal taste, inability to focus, unusual smells, lung irritation, and skin irritation. Many have sought medical help for their symptoms. Those with respiratory disorders have seen these conditions exacerbated.

123.    In addition, Plaintiffs' mental health has been adversely impacted by the injury to the peaceful enjoyment of the property that they occupied, and Plaintiffs have suffered fear, severe emotional distress, anxiety, and mental anguish.

124.    At no time did the Plaintiffs consent to the Defendants' actions and inactions in creating these conditions.

125.    As a direct and proximate result of the Defendants' creation of the nuisance, Plaintiffs have suffered injuries, damages and losses. Such harms were unique to each Plaintiff and different from damages suffered by other Plaintiffs.

126.    Accordingly, Plaintiffs each seek damages to be determined, on an individual basis, according to proof at trial, including, but not limited to compensatory damages for injury to property and interference with its use and enjoyment, and damages for physical discomfort, loss of peace of mind, unhappiness and annoyance caused by the nuisance.

## THIRD CAUSE OF ACTION

### TRESPASS TO REAL PROPERTY AND CHATTEL

#### (Against All Defendants)

127.    Plaintiffs adopt and incorporate Paragraphs 1-127 as if fully set forth here.

128.    Plaintiffs are in lawful possession of their properties.

139.    As a result of the conduct and activities of the Defendants, contaminants from the fire have and continue to physically intrude onto and wrongfully enter Plaintiffs' properties, thereby interfering with the Plaintiffs' possessory interests in their properties without Plaintiffs' permission.

130.    The physical intrusion of the contaminants emitted by Defendants onto and into the Plaintiffs' properties has physically injured and damaged Plaintiffs' properties by contaminating the soil, fixtures, structures and other physical aspects of Plaintiffs' properties. Also, Defendants' trespass to Plaintiffs' personal property physically injured and damaged Plaintiffs' personal properties by contaminating the properties, fixtures, structures, and other physical aspects of Plaintiffs' personal properties This would not have occurred but for the actions of the Defendants.

131.    The physical intrusion of the contaminants onto and into the properties owned by the Plaintiffs diminished the value of Plaintiffs' real properties.

132.    The trespass caused Plaintiffs to suffer, and continue to suffer, from inconvenience, annoyance, and personal discomfort. That inconvenience, personal discomfort, and annoyance is including, but not limited to, nasal and eye irritation, difficulty breathing, headaches, nosebleeds, sore/scratchy throat, lung congestion, fatigue, runny nose/nasal drip, burning lungs, dizziness, shortness of breath, unexplained discharge of blood, sores, metal taste, inability to focus, unusual smells, lung irritation, and skin irritation. Many have sought medical help for their symptoms. Those with respiratory disorders have seen these conditions exacerbated.

133.    In addition, Plaintiffs' mental health has been adversely impacted by the injury to the peaceful enjoyment of the property that they occupied, and Plaintiffs have suffered fear, severe emotional distress, anxiety, and mental anguish.

134.    Defendants' trespass was the actual and proximate cause of the Plaintiffs' damages and losses including, but not limited to, diminution of the value and marketability of their properties and their property rights; the loss of use of their properties; the loss of use and enjoyment of their properties; and discomfort, inconvenience and annoyance. Defendants are thus liable for the compensatory damages to the Plaintiffs, to be determined on an individual basis, according to proof at trial.

## FOURTH CAUSE OF ACTION

### STRICT LIABILITY FOR ULTRAHAZARDOUS ACTIVITIES

#### (Against All Defendants)

135.    Plaintiffs adopt and incorporate Paragraphs 1-135 as if fully set forth here.

136.    The operation of a large-scale lithium-ion battery storage facility involves ultrahazardous activities that pose significant risks to public health and safety.

137.    Operation of a large-scale lithium-ion battery storage facility, especially one utilizing NMC batteries which are more prone to catch fire, creates a high degree of risk to the surrounding community. As shown by the January 16, 2025, fire and chemical plume,

even a small incident at the facility had the potential to result in widespread harm, including the release of toxic chemicals that endangered the health of thousands of residents in Moss Landing and other surrounding areas.

138.    The harm caused by the lithium-ion battery fire includes severe health effects, property damage, and prolonged disruption to the lives and livelihoods of those affected.

139.    Despite safety protocols and fire suppression systems, risks associated with the operation of a large-scale lithium-ion battery storage facility cannot be fully eliminated through the exercise of reasonable care.  The inherent risks of chemical reactions, especially in NMC batteries, including thermal runaway, remain present even with the implementation of safety measures.

140.    Operation of a large-scale lithium-ion battery storage facility, that is enclosed and utilizes NMC batteries, near residential neighborhoods and businesses is not a common or

appropriate activity. The Moss Landing BESS facility was near a densely populated area, increasing the potential harm to the community in the event of an incident.

141.    While BESS facilities may serve a commercial purpose, the extreme danger posed by these facilities, as demonstrated by the catastrophic event on January 16, 2025, far outweighs any value it may provide to the community. The resulting health hazards, evacuations, business closures, and environmental damage underscore the ultrahazardous nature of Defendants' operations.

142.    Because the operation of a large-scale lithium-ion battery storage facility is an ultrahazardous activity, Defendants are strictly liable for any harm proximately resulting from these activities.

143.    As a direct and proximate result of Defendants' engagement in ultrahazardous activities, Plaintiffs suffered injuries, damages and losses, including, but not limited to, those damages previously described.

144.    Accordingly, Plaintiffs each seek damages to be determined, on an individual basis, according to proof at trial, including, but not limited to, compensatory damages for

1    medical care, pain and suffering, emotional anguish, injury to real and personal property,

2    remediation costs, loss of income, relocation and evacuation expenses, and substantial

3    interference with their use and enjoyment of their properties.

### FIFTH CAUSE OF ACTION

### STRICT PRODUCT LIABILITY

### (Against All Defendants)

7    145.    Plaintiffs adopt and incorporate Paragraphs 1-145 as if fully set forth here.

8    146.    Plaintiffs are informed and believe that the lithium-ion batteries designed,

9    manufactured, and sold by the LG Defendants in this case were defectively manufactured,

10   leading to thermal runaway and resulting in the Moss Landing BESS facility fire on January

11   16, 2025.

12   147.    Plaintiffs are informed and believe that the lithium-ion batteries designed and

13   sold by LG Defendants in this case were defectively designed, leading to thermal runaway

14   and resulting in the Vistra Fire on January 16, 2025.

15   148.    Plaintiffs are informed and believe that the lithium-ion batteries designed and

16   sold by the LG DEFENDANTS were distributed without adequate instructions or warnings

17   of the potential for harm for thermal runaway, resulting in the Moss Landing BESS facility

18   fire on January 16, 2025.

19   149.    Plaintiffs are informed and believe that the lithium-ion batteries designed and

20   sold by the LG DEFENDANTS were substantially the same at the time of the fire as when

21   they left LG's possession. Furthermore, Plaintiffs are informed and believe that the lithium-

22   ion batteries were used or misused in a way that was foreseeable—they were placed in

23   battery racks at the Moss Landing BESS facility to store electricity reserves for use during

24   peak hours, per the facility design. Plaintiffs further are informed and believe that the

25   manufacture and design of the lithium- ion battery was a substantial factor in causing the

26   initial fire and subsequent harm experienced by Plaintiffs.

27   150.    Plaintiffs are informed and believe that VISTRA DEFENDANTS collaborated

28   with LG DEFENDANTS in the manufacture and design of the batteries responsible for the

Vistra Fire. VISTRA DEFENDANTS purchased 110,000 batteries from LG DEFENDANTS for the Moss Landing BESS facility, and were in the unique position to both benefit from the creation of the Moss Landing BESS facility AND to influence the manufacturing and design of the batteries for the facility.

151.    Plaintiffs are informed and believe that VISTRA DEFENDANTS collaborated with LG DEFENDANTS and Defendant PG&E in the defective facility design of the Moss Landing BESS facility, which included stacking thousands of NMC lithium-ion batteries in racks in an enclosed space, leading to thermal runaway and the fire on January 16, 2025.

152.    Plaintiffs are informed and believe that VISTRA DEFENDANTS failed to offer adequate warning to the general public regarding the dangers posed by a massive, enclosed NMC lithium-ion battery storage facility in a populated area.

153.    Plaintiffs are informed and believe that Defendant PG&E collaborated with VISTRA and LG DEFENDANTS on the manufacture and design of the batteries responsible for the Vistra Fire, as well as the design and creation of the Moss Landing BESS facility.

154.    Plaintiffs allege that Defendant PG&E failed to provide adequate warnings to the community regarding the risks of having a massive, enclosed NMC lithium-ion BESS facility in a populated area.

155.    Defendant PG&E is the sole purchaser and distributor of the power stored at the Moss Landing BESS facility. As such, Defendant PG&E is in a unique position to financially benefit from the faulty LG batteries. PG&E was integral to the design and existence of the Moss Landing BESS battery storage facility, and had a substantial ability to influence the battery manufacturing and design and the facility design to ensure safety.

156.    The risk of fire was reasonably foreseeable at an enclosed, massive battery storage facility. Lithium-ion batteries are well known to have issues with thermal runaway, resulting in ignition. In fact, the Moss Landing BESS facility has previously experienced at least two fires or "overheating" events since 2020.

157.    Plaintiffs allege that they were injured by the defects in manufacturing and design when the batteries caught fire, spewing toxins and PM into the air, and that there were

COMPLAINT

inadequate warnings regarding the risks of having a massive, enclosed BESS facility in a populated area.

158.    It was reasonably foreseeable that in the event of a fire at the Moss Landing BESS facility, that residents in the surrounding area would be injured and their property would be damaged by toxins and particulate matter released from the fire. The risks of catastrophic fire did not outweigh the potential benefits.

159.    Accordingly, Plaintiffs each seek damages to be determined, on an individual basis, according to proof at trial, including, but not limited to, compensatory damages for medical care, pain and suffering, emotional anguish, injury to real and personal property, remediation costs, loss of income, relocation and evacuation expenses, and substantial interference with their use and enjoyment of their properties.

### SIXTH CAUSE OF ACTION

### INVERSE CONDEMNATION

### (Against Vistra and PG&E Defendants Only)

160.    Plaintiffs adopt and incorporate Paragraphs 1-160 as if fully set forth here.

161.    On January 16, 2025, Plaintiffs were the owners of real property and personal property in the area of the Moss Landing BESS facility.

162.    Prior to and on January 16, 2025 the VISTRA DEFENDANTS and PG&E had each designed, constructed, installed, operated, controlled, used, and/or maintained the facilities, lines, wires, battery storage, and/or other electrical equipment within PG&E's and VISTRA's utility infrastructure, including the transmission and distribution lines in and around the location of Moss Landing, to provide electrical services to large swaths of the public.

163.    Prior to and on January 16, 2025, Defendants knew that the battery storage and electrical equipment within PG&E's and VISTRA's electrical-utility infrastructure (as deliberately designed and constructed) could ignite a fire, go into thermal runaway, destroy property, and cause toxic chemicals to inundate the surrounding communities. Accordingly,

VISTRA AND PG&E knew the risks and dangers of their electrical equipment and battery storage and the need for proper maintenance, upkeep, design, and battery choice.

164.    These inherent risks were realized on January 16, 2025, when the Vistra Fire erupted, which resulted in the taking of Plaintiffs' real property and/or private property.

165.    This taking was legally and substantially caused by Defendants' actions and inactions in designing, constructing, installing, operating, controlling, using, and/or maintaining the facilities, lines, wires, battery storage, and/or other electrical equipment within PG&E's and VISTRA's utility infrastructure.

166.    Plaintiffs have not been adequately compensated, if at all, for this taking.

167.    Plaintiffs also seek, under Code of Civil Procedure section 1036, to recover all reasonable costs, disbursements, and expenses, including reasonable attorney, appraisal, and engineering fees, incurred because of this proceeding in the trial court and/or in any appellate proceeding in which Plaintiffs prevail on any issue.

///

///

COMPLAINT

## V.   <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants as follows:

   a. For compensatory damages in an amount to be proven at trial;

   b. For punitive damages sufficient to deter future misconduct;

   c. For an award of attorneys' fees and costs;

   d. For pre- and post-judgment interest as allowed by law; and

   e. For such other and further relief as this Court deems just and proper.

## VI.   <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs demand a trial by jury on all issues so triable.

DATED:  February 26, 2025     **DOWNTOWN L.A. LAW GROUP**



_____

    Andrew M. Morrow, III, Esq.
    Ezequiel Z. Gurule, IV, Esq.
    Attorney for Plaintiffs,
    Nicole Jackson et. al.

COMPLAINT